IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CONSTANCE FINLEY,                          No. C 06-6247 CW

          Plaintiff,                        ORDER GRANTING IN
                                            PART AND DENYING
     v.                                     IN PART
                                            PLAINTIFF'S
HARTFORD LIFE AND ACCIDENT INSURANCE        MOTION FOR
CO.; THE BOSTON FINANCIAL GROUP LONG-       SUMMARY
TERM DISABILITY PLAN; and DEMPSEY           ADJUDICATION ON
INVESTIGATIONS, INC.,                       THE STANDARD OF
                                            REVIEW
          Defendants.

_____/

     Plaintiff moves for summary adjudication on the standard of

review, seeking a determination that de novo is the appropriate

standard of review of her claim for benefits.[1]  Defendants Hartford

Life and Accident Insurance Co. and The Boston Financial Group

Long-Term Disability Plan oppose the motion and argue that abuse of

discretion is the appropriate standard of review.  Having

_____

     [1]This motion was unauthorized.  The Court's scheduling order
does not provide for a motion for summary adjudication on the
standard of review; the Court contemplated a single motion that
would be heard on November 16, 2007.  Nonetheless, the Court will
address Plaintiff's motion.

considered all of the papers filed by the parties, the Court grants

in part Plaintiff's motion and denies it in part: de novo review is

not appropriate, but the Court shall apply an abuse of discretion

review with a moderate degree of skepticism.

BACKGROUND

Defendant Hartford issued, and administers, a group long-term

disability policy insuring the Boston Financial Group Long-Term

Disability Plan (the Plan). The policy grants Defendant Hartford

"full discretion and authority to determine eligibility for

benefits and to construe and interpret all terms and provisions of

the Group Insurance Policy."[2] Roberts Dec., Ex. B at P00153. This

policy covers eligible Boston Financial Group employees, such as

Plaintiff, in the event they become totally disabled. Plaintiff

became totally disabled as a result of right shoulder impingement

syndrome and left cubital tunnel syndrome. And, on August 16,

1997, Defendant Hartford approved Plaintiff's disability claim. It

paid Plaintiff benefits under the Plan from August, 1997 to

September, 2005.

In January, 2001, Defendant Hartford's Special Investigations

Unit (SIU) asked Dempsey Investigations to perform surveillance on

Plaintiff.[3] Pursuant to Defendant Hartford's instruction, a

---

[2]Plaintiff points out that, as part of a settlement with the California Insurance Commissioner, Defendant Hartford has agreed to remove this and similar "discretionary" clauses from its policies.

[3]This was only one of at least 900 surveillance investigations that Dempsey would perform for Defendant Hartford in 2001. Dempsey performed its investigations according to Defendant Hartford's policies and procedures regarding surveillance. Defendant Hartford was Dempsey's major client and, in 2005, when Dempsey lost Defendant Hartford's business, Dempsey shut down.

<b>United States District Court</b>
For the Northern District of California

1  Dempsey investigator conducted surveillance of Plaintiff on

2  February 2, 3 and 4, 2001.  On February 7, 2001, Dempsey reported

3  the results of its surveillance and submitted to the SIU a video of

4  the surveillance.  The report indicates that all three days

5  Plaintiff was videotaped in her kitchen.

6       According to Richard Sawn, Dempsey's vice president, after

7  receiving the February 7, 2001 report, Jack McGoldrick, SIU's vice

8  president, contacted him.  Mr. McGoldrick requested that Dempsey

9  delete the video of Plaintiff in her home "because it was in the

10 residence and they didn't want that video."  Sawn Dep., 43:22-44.

11 Pursuant to that request, someone at Dempsey revised the video,

12 deleting images of Plaintiff in her residence.  The report was also

13 revised to reflect that the investigator "observed" Plaintiff in

14 her home, not that he videotaped her in her home.  Dempsey then

15 resubmitted to Defendant Hartford the surveillance video and

16 report.[4]  The revised report and cover letter contained the same

17 date as the original report and cover letter: February 7, 2001.[5]

18 Mr. Sawn called Mr. McGoldrick to make sure the revised report and

19 video "looked all right."  <u>Id.</u> at 73:9-10.  Even though Mr. Sawn

20 states that, in 2001, Defendant Hartford asked Dempsey to revise

21 the surveillance video and report, Defendant Hartford states that

22 it did not request, and Dempsey did not send, a revised February 7,

23

24      [4]Plaintiff states that this video shows an image of her
   throwing a ball to her service dog; it is time stamped 2:08:28-
25 2:08:54.  This image, with the same time stamp, immediately repeats
   itself, making Plaintiff appear to be more physically active than
26 she was.

27      [5]Dempsey no longer has the original report.  Until recently,
   the original video was missing.

28                                    3

1  2001 report and video in 2001.

2      Defendant Hartford retained Dempsey again to conduct

3  surveillance on Plaintiff.  On October 21 to October 23, 2007,

4  Plaintiff was under surveillance.  The report from Dempsey

5  concerning this surveillance is dated October 30, 2001; however,

6  the report contains a telephone area code that was not used until

7  2002.

8      In May, 2005, Plaintiff's case was again referred to SIU.  An

9  activity log shows that, at the end of May, Defendant Hartford's

10 employee contacted Dempsey to obtain copies of the prior

11 surveillance it had conducted on Plaintiff.  The log notes that, on

12 June 7, 2005, Defendant Hartford received copies of the

13 surveillance reports and that the videos would follow.  Although it

14 is dated February 7, 2001, Defendant Hartford admits that this

15 report is different from the first report Dempsey sent.  Like the

16 allegedly revised report sent in 2001, the report sent in 2005

17 refers to "observing" Plaintiff in her home, not "video of" her in

18 her home.  The report sent in 2005 refers to a telephone area code

19 that did not come into existence until 2002 and an email address

20 that Dempsey did not use until 2004.  Defendant Hartford contends

21 that any alterations made to the February 7, 2001 report were made

22 independently by Dempsey, without prodding from Defendant Hartford.

23 Because the report contains the email address Dempsey began using

24 in 2004, Defendant Hartford contends that Dempsey did not alter the

25 video until 2004 or 2005.  Indeed, Plaintiff acknowledges that the

26 activity log and backdated invoices suggest that the February, 2001

27 report and video were not revised until 2005.

28                                    4

1    In June, 2005, at Defendant Hartford's request, another

2 investigative firm, HUB Enterprises, performed surveillance on

3 Plaintiff.  On June 17, 2005, Plaintiff was videotaped for

4 approximately one hour and forty-five minutes: "video obtained

5 depicts [Plaintiff] walking, performing landscaping activities,

6 bending down, pulling weeds while working in a quick manner,

7 retrieving garden tools, kneeling, utilizing a tool with her right

8 [sic], utilizing both hands to remove weeds from the crack along

9 the driveway edge and pulling and cleaning the weeds from the

10 cracks."  Roberts Dec., Ex. J.  The next day, she was videotaped

11 for approximately six minutes: "video obtained depicts [Plaintiff]

12 walking at a quick pace, carrying a bag on her left shoulder,

13 bending to retrieve a newspaper off the ground, entering a vehicle,

14 operating a vehicle and brushing her dogs."  Id.

15    Following the surveillance, Defendant Hartford's investigator

16 interviewed Plaintiff at her home.  The investigator showed

17 Plaintiff the surveillance video.  Plaintiff acknowledged that

18 "some of the activities seen on the video exceeded the restrictions

19 and limitations outlined by her doctor" and what she had reported

20 to Defendant Hartford.  McIssac Dec., Ex. 3.  She explained, "I was

21 able to do those activities on those days because I had to put the

22 pain aside out of frustration and not having the funds to hire

23 someone to do it for me . . . . It was bizarre that the only day in

24 the last nine years that I did landscaping I was videotaped.  It

25 took me two weeks to recover by resting and bring [sic] the pain

26 down to my usual level of pain."  Id.

27

28

5

1    Defendant Hartford requested a medical review from University

2 Disability Consortium (UDC).  Dr. Brian Mercer, Board Certified in

3 Neurology, reviewed Plaintiff's medical records and the

4 surveillance from June, 2005.  He did not examine Plaintiff; UDC

5 physicians do not examine patients.  Nor did he review the

6 February, 2001 video surveillance.  Dr. Mercer called Plaintiff's

7 physician, who stated that he had not seen Plaintiff in over six

8 months.  Dr. Mercer concluded that Plaintiff's symptoms and

9 limitations were inconsistent with the activities performed on the

10 2005 video surveillance and that there were no objective

11 abnormalities that would preclude Plaintiff from functioning at a

12 full-time light level job.  Plaintiff notes that Defendant Hartford

13 has a "volume discount type arrangement" with UDC.  Strang Dep.

14 39:20-21.  Approximately seventy-five percent of UDC's revenue is

15 from its business with Defendant Hartford.  Id. at 39:11.

16    On September 21, 2005, Defendant Hartford terminated

17 Plaintiff's benefits on the grounds that she was no longer totally

18 disabled as defined under the policy.  In reaching this conclusion,

19 Defendant Hartford largely relied upon the July, 2005 surveillance

20 and Dr. Mercer's findings.  On March 22, 2006, Plaintiff appealed

21 the termination of her benefits.

22    Defendant Hartford requested that two other physicians, one

23 certified in neurology and clinical neurophysiology, and another

24 certified in physical medication, rehabilitation and pain medicine,

25 review Plaintiff's medical records and the July, 2005 surveillance.

26 These doctors are employed by Reed Review Services, not UDC.  Even

27 though the surveillance video showed less than two hours of

28
                                    6

1  activity spread throughout the day, one doctor noted that Plaintiff

2  spent "several hours performing gardening activities."  Roberts

3  Dec., Ex. M.  Like Dr. Mercer, both doctors concluded that

4  Plaintiff was capable of full-time work.

5      Although Plaintiff requested that she be permitted to respond

6  to any new evidence Defendant Hartford generated, Defendant

7  Hartford did not provide Plaintiff the opportunity to rebut these

8  doctors' conclusion.  And, on April 24, 2006, Defendant Hartford

9  upheld its original decision to terminate Plaintiff's benefits.

10  Defendant Hartford did not provide Plaintiff with the reports from

11  the physicians at Reed Review Services until June 28, 2006.

12      On September 1, 2006, Plaintiff sent a letter to Defendant

13  Hartford, attempting to supplement her request for review by

14  submitting her doctor's response to the Reed Review Services'

15  physicians' reports.  The letter further noted that Defendant

16  Hartford "had not complied with ERISA, and the regulations issued

17  thereunder, due to its continuing failure to provide copies of the

18  surveillance tapes of the surveillance conducted on February 2,

19  2001 through February 4, 2001 by Dempsey."  Roberts Dec., Ex. N.

20      Five days later, Defendant Hartford returned the additional

21  materials Plaintiff had submitted.  The letter explained, "Because

22  we closed our administrative record for this claim on 4/26/06, we

23  have not reviewed and are returning the documents you included with

24  your 9/1/06 letter."  As for the requested surveillance video, the

25  letter stated that Plaintiff's request was forwarded to Theresa

26  Marciel-Carr and that Plaintiff should hear from her soon.  Neither

27  Ms. Marciel-Carr nor anyone from Defendant Hartford, however,

28

7

1 contacted Plaintiff or her attorney until after Plaintiff filed

2 this motion. Defendant Hartford has now located the February, 2001

3 surveillance video. On July 26, 2007, the discovery-cut off date,

4 it provided Plaintiff with a copy. According to Plaintiff,

5 however, Defendant Hartford has yet to provide it with a copy of

6 the original February, 2001 report with a SIU bates-stamp number.

7                              DISCUSSION

8     The standard of review of a plan administrator's denial of

9 ERISA benefits depends upon the terms of the benefit plan. Absent

10 contrary language in the plan, the denial is reviewed under a de

11 novo standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,

12 115 (1989). However, if "the benefit plan expressly gives the plan

13 administrator or fiduciary discretionary authority to determine

14 eligibility for benefits or to construe the plan's terms," an abuse

15 of discretion standard is applied. Id. at 102; Abatie v. Alta

16 Health & Life Insurance Co., 458 F.3d 955 (9th Cir. 2006) (en

17 banc). There is, however, an exception to this rule. Abatie, 458

18 F.3d at 971. Here, there is no dispute that the Plan confers

19 discretion. Thus, unless an exception applies, abuse of discretion

20 is the appropriate standard of review.

21     In Abatie, the Ninth Circuit noted that it had recently held

22 that an administrator's failure to comply with ERISA procedural

23 requirements generally does not alter the standard of review from

24 abuse of discretion review to de novo review. Id. (citing Gatti v.

25 Reliance Standard Life Ins. Co., 415 F.3d 978, 985 (9th Cir.

26 2005)). The court recognized, "There are, however, some situations

27 in which procedural irregularities are so substantial as to alter

28

                                  8

the standard of review," including when "an administrator engages

in wholesale and flagrant violations of the procedural requirements

of ERISA, and thus acts in utter disregard of the underlying

purpose of the plan as well." Id. In that situation, the court

will "review de novo the administrator's decision to deny

benefits." Id. As an example of "this kind of egregious act," the

court described the administrator's actions in Blau v. Del Monte

Corp., 748 F.3d 1348 (9th Cir. 1984). There, the administrator

kept the policy details secret from the employees, offered the

employees no claims procedure, and did not provide the employees in

writing the relevant plan information: "in other words, the

administrator 'failed to comply with virtually every applicable

mandate of ERISA.'" Abatie, 458 F.3d at 971 (quoting Blau, 748

F.2d at 1353).

Plaintiff argues that, here, there were flagrant procedural

violations and, therefore, the Court should review de novo

Defendant Hartford's decision to terminate her long-term disability

benefits. Contrary to Plaintiff's argument, Defendant Hartford's

actions are not comparable to those in Blau. Plaintiff's

allegation that Defendant Hartford had its investigators alter a

video is troubling, and there is evidence to support that

allegation. The belated finding of the misplaced 2001 video is

also troubling. Nonetheless, reviewing the record, the Court does

not find flagrant violations of ERISA procedure. The procedural

irregularities here were not "so substantial as to alter the

standard of review." 458 F.3d at 971. Thus, under Abatie, an

abuse of discretion remains the proper standard of review.

9

1    An abuse of discretion standard permits "a court to tailor its

2 review to all the circumstances before it," including taking into

3 account any conflict of interest.  Id. at 968.  Previously, in

4 Atwood v. Newmont Gold Co. Inc., 45 F.3d 1317, 1323 (9th Cir.

5 1995), the Ninth Circuit held that, in particular situations, when

6 an administrator had a conflict of interest, de novo review could

7 be appropriate.  In Abatie, however, the Ninth Circuit held that

8 its decision in Atwood conflicted with Supreme Court precedent.

9 Therefore, the court held that "abuse of discretion review,

10 tempered by skepticism commensurate with the plan administrator's

11 conflict of interest," rather than de novo review, applies in

12 situations where "a plan administrator denies benefits and (1) the

13 wording of the plan confers discretion on the plan administrator

14 and (2) the plan administrator has a conflict of interest."  458

15 F.3d at 959.

16    To determine the level of skepticism to apply, the court must

17 consider "all the facts and circumstances."  Id. at 968.  The Court

18 in Abatie explains:

19       The level of skepticism with which a court views a conflicted
         administrator's decision may be low if a structural conflict
20       of interest is unaccompanied, for example, by any evidence of
         malice, of self-dealing, or of a parsimonious claims-granting
21       history.  A court may weigh a conflict more heavily if, for
         example, the administrator provides inconsistent reasons for
22       denial, fails adequately to investigate a claim or ask the
         plaintiff for necessary evidence, fails to credit a claimant's
23       reliable evidence, or has repeatedly denied benefits to
         deserving participants by interpreting plan terms incorrectly
24       or by making decisions against the weight of evidence in the
         record.

25
Id. at 968-69.
26

27

28
                                    10

1    Just as there is no dispute that the Plan here confers

2   discretion, there is no dispute that Defendant Hartford has a

3   structural conflict: it is both the plan administrator and the

4   funding source.  Defendant Hartford contends that this is the only

5   evidence of conflict and, therefore, the level of skepticism with

6   which the Court reviews Hartford's benefits decision should be low.

7   This contention is without merit.  As Plaintiff notes, the

8   physician reports upon which Defendant Hartford relied mis-

9   characterized the evidence and ignored any evidence by Plaintiff

10   supporting her disability.  For example, one report states that

11   Plaintiff was gardening for several hours; indeed, Defendant

12   Hartford makes the same statement in its opposition.  That

13   statement, however, is not supported by the evidence which shows

14   less than two hours of scattered activity over a ten-hour

15   surveillance period.  Nor was it noted that the investigator from

16   HUB stated that Plaintiff appeared to show discomfort in her hands,

17   shaking them from time to time.

18    Further, Defendant Hartford does not address the potential

19   conflict arising from its "volume discount type arrangement" with

20   UDC and the fact that it is the only insurer with which UDC has a

21   contract.  Defendant Hartford does not deny that it prevented

22   Plaintiff from responding to any medical records generated after

23   she submitted her request for review; it denied her request for

24   review a month after that request was submitted, closing

25   Plaintiff's file that day.  As noted above, Defendant Hartford then

26   refused to consider Plaintiff's doctor's responses to the medical

27   reviews Defendant Hartford procured after the request for review.

28

                              11

1    Therefore, the Court shall apply an abuse of discretion review

2 with a moderate degree of skepticism.

3                                    CONCLUSION

4    Plaintiff's Motion (Docket No. 33) is GRANTED IN PART and

5 DENIED IN PART and the hearing noticed for August 23, 2007 is

6 VACATED.  De novo review is not appropriate.  The Court, however,

7 finds that there is a structural conflict of interest that is

8 accompanied by evidence of self-dealing.  Therefore, the

9 appropriate review is abuse of discretion with a moderate degree of

10 skepticism, "commensurate with the plan administrator's conflict of

11 interest."  Abatie, 458 F.3d at 959.

12    IT IS SO ORDERED.

13

14 Dated: 8/20/07

15                                    CLAUDIA WILKEN
                                     United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    12