IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CONSTANCE FINLEY, | No. C 06-6247 CW |
| Plaintiff, | ORDER DENYING THE PARTIES' MOTIONS FOR JUDGMENT, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND REMANDING PLAINTIFF'S DISABILITY CLAIM TO HARTFORD |
| v. | |
| HARTFORD LIFE & ACCIDENT INSURANCE CO.; THE BOSTON FINANCIAL GROUP LONG-TERM DISABILITY PLAN; and DEMPSEY INVESTIGATIONS, INC., | |
| Defendants. | |
| _____/ | |

Plaintiff Constance Finley moves for judgment on her claim for disability benefits under the Employee Retirement Income Security Act (ERISA). Defendants Hartford Life & Accident Insurance Co. (Hartford) and The Boston Financial Group Long-Term Disability Plan cross-move for judgment on this claim and move for summary judgment on Plaintiff's claims for trespass and invasion of privacy.[1] Plaintiff does not oppose Defendants' motion with respect to her trespass claim, but she does oppose Defendants' motion with respect to her invasion of privacy claims. The matter was heard on

---

[1] As used in this order, "Defendants" refers only to these two Defendants; it does not refer to Dempsey Investigations, Inc.

November 29, 2007.  Having considered oral argument and all of the papers submitted by the parties, the Court denies the parties' motions for judgment on Plaintiff's ERISA claim and grants Defendants' motion for summary judgment on Plaintiff's privacy claims.  Plaintiff's claim for disability benefits is remanded to Hartford for further proceedings.

BACKGROUND

I.   Findings of Fact on Plaintiff's ERISA Claim

Having considered the evidence in the record, the Court finds the following facts with respect to Plaintiff's ERISA claim.

A.   Plaintiff's Employment and Injury

In early 1996, when she was self-employed, Plaintiff began to experience pain in her right shoulder and stopped working for a time while she underwent a course of physical therapy.  By June of that year, she considered herself sufficiently recovered to resume work and, on June 24, she began working for The Boston Financial Group (Boston) as a vice president and senior banker.  In her position, she negotiated contracts, marketed projects to developers and spoke at conferences.  The job involved frequent travel, and Plaintiff was away from home a majority of the time.  She worked an average of sixty-five to seventy-five hours a week.

On October 8, 1996, Plaintiff injured her shoulder while carrying a box of documents at work.  She underwent surgery to remove portions of bone, bone spurs and scar tissue from her shoulder, but continued to experience pain even after the surgery. She took a brief amount of time off work, but soon resumed working full-time.  In February, 1997, Plaintiff began to experience spasms

2

in her left arm, rendering it unusable.  The pain in her arms prevented her from doing ordinary activities of daily life, such as opening a door, lifting a pot, driving a car and sleeping.  Because the pain prevented her from performing the duties expected of her at work, she stopped working for Boston on May 15, 1997.

Boston maintains a long-term disability plan (the Plan) that covers eligible employees in the event they become totally disabled.  The Plan is administered and insured by Hartford.  The Plan document defines "total disability" as a condition where, during the first thirty-six months, the insured is "prevented by Disability from doing all the material and substantial duties of [his or her] own occupation on a full time basis."  Roberts Dec. Ex. 2 at P00154.  After the first thirty-six months, the definition includes only individuals who are "prevented by Disability from doing any occupation or work for which [they] are qualified by training, education, or experience."  Id.

Plaintiff filed a claim for disability benefits as a result of her diagnosis of bilateral thoracic outlet syndrome, left cubital tunnel syndrome and right shoulder impingement syndrome.  On August 16, 1997, Hartford approved this claim and began paying Plaintiff benefits.

B.    The June, 2005 Surveillance of Plaintiff

In June, 2005, at Hartford's request, an investigative firm, HUB Enterprises, performed surveillance on Plaintiff.  On June 17, 2005, Plaintiff was videotaped outside her home during several periods of time, all falling between approximately 9:40 a.m. and

3

2:15 p.m.[2] The video depicts her in her yard, conversing with her gardeners and assisting them with various aspects of their work. Between approximately 10:08 a.m. and 10:21 a.m., Plaintiff is seen bending over to remove weeds and pick flowers from areas of heavy growth. She is also depicted continuing this type of activity at various times between approximately 10:51 a.m. and 11:48 a.m., when she enters her house. Throughout these periods, Plaintiff can clearly be seen grasping at the stems of tall plants and pulling them out forcefully. However, during the latter period, the video does not run continuously and Plaintiff is frequently obscured or out of sight, making it difficult to determine the exact nature of her activities.

Plaintiff next appears at approximately 1:05 p.m., when she begins to remove smaller weeds from around the edge of her driveway. Nothing obscures the camera's view of her activities at this time. Kneeling on a pad, bending forward while supporting her weight with her arm, she uses a trowel to dig into the soil and pry the weeds out. She also uses a hook-type instrument to scrape forcefully around the edge. She pulls strenuously at the weeds with her fingers and grips them with her fist to rip them out. The ground appears to be dry and the weeds do not come out easily.

Plaintiff continues along the driveway until 1:31 p.m., then moves to another part of her garden, where she resumes pulling larger weeds until about 2:08 p.m. In addition to the previously described activities, during this period she is seen carrying a

---

[2]The video was submitted to the Court as Exhibit 11 to the Roberts Declaration.

4

basket of weeds and throwing weeds several feet with both arms,
using both underhanded and overhanded motions.  She also signals to
her gardeners by raising her right arm above her head until it is
vertical and maintaining it there for several seconds.

Throughout the video, Plaintiff moves at a normal speed and
displays no clear outward signs of pain.  She can, however, be seen
shaking her hands, particularly near the end of the video, between
2:08 p.m. and 2:15 p.m., just after she has finished the yard work
and before she returns inside the house.

The next day, June 18, 2005, HUB Enterprises again performed
surveillance on Plaintiff.  In the video from this surveillance,
Plaintiff is seen driving her two dogs to the San Francisco Bay
trail.  She departs on the trail at 11:31 a.m., walking in an
unrestricted manner.  The HUB investigator accompanies Plaintiff on
the trail until 11:40 a.m., then returns to the parking lot.
Plaintiff is seen returning to her car with her dogs at 12:57 p.m.
At this time, a long-sleeved shirt that she had been wearing when
she started is tied around her waist.  She then brushes her dogs
using apparently unrestricted arm movements.

C.   Plaintiff's Statements on July 29, 2005

On July 29, 2005, a Hartford investigator visited Plaintiff at
her home.  Prior to showing her the surveillance video, he
interviewed her about her condition and prepared a statement for
her to sign.  The document contained, among others, the following
statements:

> I am able to walk about twenty or thirty minutes and
> other days is [sic] painful after five minutes.

5

I am able to lift and carry items that weigh as little as
possible I limit it to less than five pounds.

I am not able to push and pull because of the pain in my
upper body.

I am not able to reach overhead because it is very
painful in the area of my shoulders.

I do not have full use of my hands and fingers, using my
thumbs aggravate[s] the pain in my hands. . . . My grip
strength is not enough to open a jar or a bottle; but I
have a tool to open jars and bottles. [It] is not because
of lack of strength [it] is because of the pain it causes
me.

On my best day I can walk my dogs for a mile, I may go to
the beach with a friend or go out to eat or go to a
movie.  That is the most activity I can do on a best day.

In the last 6 months, my condition has improved for about
three weeks and there was [a] period that it got worse
but mostly it has remained the same.  During the past 6
months, I have not experienced a time when I could exceed
the level of functionality or be more active than I have
described above.

Welch Dec. Ex. D at SIU100-106.  Before signing the statement,

Plaintiff made several edits by crossing out certain words and

writing in others.  Id.

The statement does not disclose an improvement -- even a

temporary one -- of the type depicted in the surveillance video.

At her deposition, Plaintiff explained this by saying:

When the special investigator came, he asked me, "Has
[sic] there been any times in the last" blah, blah, blah
"where you felt better than other times?"  And I said,
"Yes.  In June, I actually had a two-week period in which
I thought I might be getting better, and maybe even like
[sic] that I was going to recover."  I said, "I felt
amazingly better."  And he said, "Well, what did that
mean?"  I said, "I gardened with my gardeners, which is
something I never am able to do."  I described the whole
thing to him.  And so he said, "Well, do you still feel
better?"  I said, "No.  I immediately got much, much
worse and spent most of July in bed."  So then later he
placed the -- he didn't put that in my statement.  He
said it was irrelevant because I had gotten better.

6

United States District Court
For the Northern District of California

Roberts Dec. Ex. 10 at 35. The record is silent as to whether the investigator would corroborate Plaintiff's account of her exchange with him.

After Plaintiff signed her statement, the investigator showed her the surveillance video. He then prepared a second statement, which Plaintiff revised and then signed. In this statement, Plaintiff acknowledged that:

> "[S]ome of the activities seen on the video exceeded the restrictions and limitations outlined by my doctor, and what I have reported to The Hartford Life Company, but I was able to do those activities on those days because I had to put the pains aside out of frustration and not having the funds to hire someone to do it for me. . . . It was bizarre that the only day in the last nine years that I did landscaping I was videotaped. It took me two weeks to recover by resting and bring [sic] the pain down to my usual level of pain. My gardener repeatedly urged me to stop knowing that I was vastly exceeding my physical limitations.

Welch Dec. Ex. D at SIU098-099. She also stated that the weeds were in mud and came out easily, and that her gardeners did all of the lifting.

D.   Hartford's Denial of Plaintiff's Disability Claim

Following Plaintiff's interview, Hartford requested a medical review from University Disability Consortium (UDC). Dr. Brian Mercer, board-certified in neurology, reviewed Plaintiff's medical records and the surveillance videos described above. He did not examine Plaintiff; UDC physicians do not examine patients. Dr. Mercer also called Plaintiff's physician, Dr. Steven Blackman, who stated that he had not seen Plaintiff in over six months. Dr. Mercer found that Plaintiff's records revealed no objective abnormalities that would preclude her from functioning at a full-

7

time light-level job.  He also found that Plaintiff's subjective
symptoms and limitations, as reported to Hartford and her
physicians, were inconsistent with the activities depicted on the
videos.

Plaintiff notes that Dr. Mercer is a part-time employee of UDC
and participates in the company's profit-sharing plan.
Approximately seventy-five percent of UDC's revenue is from its
business with Defendant Hartford.

On September 21, 2005, Hartford terminated Plaintiff's
benefits on the grounds that she was no longer totally disabled as
defined under the policy.  In reaching this conclusion, Hartford
relied largely upon Dr. Mercer's findings and the discrepancy
between Plaintiff's self-reported condition and her activities in
the June, 2005 surveillance videos.  Hartford concluded that
Plaintiff was capable of performing full-time work imposing light
physical demands.  Based on her education and transferable skills,
it identified two sedentary occupations that closely matched
Plaintiff's background: a manager in the credit or collection
industry, and a vice president at a financial institution.

E.  Plaintiff's Appeal

On March 22, 2006, Plaintiff appealed the termination of her
benefits.  In support of her appeal, Plaintiff submitted a letter
from Dr. Blackman, who treated Plaintiff from April, 1986 until
December, 2004.  He supported Plaintiff's account of her
disability, stating, "Over the years, she has demonstrated
objective findings to confirm her diagnosis, including muscle
weakness, joint inflammation, swelling, heat and muscle wasting,

peripheral entrapment neuropathy, and furthermore, palpatory findings such as altered muscle tone, tissue irritability, segmental facilitation, etc." Welch Dec. Ex. 2 at AR0134. Dr. Blackman concluded that the chronic nature of Plaintiff's disability prevented her "from being involved in her previous occupation on any regular basis" because her condition "limit[ed] her ability to lift, carry or type and write for long periods of time." Id. He added that chronic connective tissue disorders often cycle through episodes of improvement and worsening. However, Dr. Blackman acknowledged that he had not reviewed the June, 2005 video surveillance of Plaintiff.

Plaintiff also submitted a letter from Dr. Daniel Shadoan, whom she first saw in July, 2005, after the surveillance video had been taken. Dr. Shadoan echoed Dr. Blackman's statements, stating that Plaintiff suffers from a condition marked by pain that does not limit her anatomic range of motion. He noted that Plaintiff's "prognosis is chronic with intermittent periods of amelioration common in a chronic systemic connective tissue disorder, which may have an autoimmune basis." Welch Dec. Ex. B at AR0136. "Objectively," he said, "I find a neurologically intact female in no acute distress with chronic muscle spasm of the upper back, shoulders and neck along with segmental facilitation, which support the symptoms she describes." Id. Noting that more than ten minutes of working on the computer exacerbates Plaintiff's pain, he concluded that she would not be able to return to her former job.

Plaintiff also submitted a letter from Dr. Aimee Chagnon, whom Plaintiff began seeing on March 14, 2006, after the denial of her

9

disability benefits.  This letter repeated much of the information in the letters from Plaintiff's other two doctors.  Dr. Chagnon attached some of Plaintiff's medical records as well.

In addition to the letters from her treating physicians, Plaintiff submitted a declaration in which she addressed the activities she was performing while under surveillance.  She stated that in June, 2005, she had a two-week period in which she was "elated" because she thought she "might possibly be having a major breakthrough and getting 'well,' relatively speaking."  Welch Dec. Ex. B at AR0167.  It was during this time period that she was videotaped working in her garden.  As someone who enjoyed gardening before her disability, on June 17, 2005, Plaintiff "told [her] gardeners with excitement that [she] was going to try to work in the garden with them."  Id.  As she explained in her declaration, "I knew the pain level would go up immediately but I needed to know for me if I could do gardening and how many days it would take me to recover."  Id.  Despite her gardeners' exhortations, she began pulling weeds from what she described as a marshy area in her yard. When she went inside the house, her pain level was elevated, but she nonetheless decided to press on that afternoon because of the feeling of accomplishment.  Plaintiff stated in her declaration that the gardening was "the most physical activity" she had done since she stopped working.  Id. at AR0168.

Plaintiff supplemented her account with a declaration from her gardener.  The gardener stated that, prior to June 17, 2005, Plaintiff had helped them with gardening, but only by performing minor work such as weeding the stairs, where the weeds are easy to

remove.  Still, on these occasions, Plaintiff would complain about pain in her wrists and arms and go inside to rest after a short period of time.  The gardener reported that on the morning of June 17, 2005, Plaintiff "appeared to be feeling better and tried to do substantially more than she was ever able to do in the past." Welch Dec. Ex. B at AR0172.  During the gardening, Plaintiff "complained about her arms and indicated that she knew she needed to take a rest."  Id. at AR0173.

According to Plaintiff's declaration, on the night of June 17, 2005, her pain became very severe.  She "tried walking the next day with [her] dogs to see if walking would help."  Welch Dec. Ex. B at AR0168.  It did not, and she experienced a two-week period of intense pain.  Afterwards, her condition returned to its usual state of alternating periods of feeling better and feeling worse.

In considering Plaintiff's appeal, Hartford requested that two additional physicians, one board-certified in neurology and clinical neurophysiology, the other board-certified in physical medicine, rehabilitation and pain medicine, review Plaintiff's medical records and the July, 2005 surveillance video.  These doctors -- Bruce LeForce and Phillip Marion -- are employed by Reed Review Services (RRS), not UDC.  In a joint report, each doctor concluded individually, as did Dr. Mercer, that Plaintiff was capable of full-time work.  They both relied heavily on the surveillance video in support of their conclusion.  However, they mischaracterized the content of the video somewhat, stating that Plaintiff was depicted gardening for "several hours."

On April 24, 2006, Hartford upheld its original decision to

11

terminate Plaintiff's benefits and closed its file of Plaintiff's case.  In doing so, it relied in part on the report by provided by RRS.  Although Plaintiff requested that she be permitted to respond to any new evidence Hartford considered in reviewing her appeal, Hartford did not provide Plaintiff with the RRS report, and thus she had no opportunity to rebut the doctors' conclusions.  Hartford did not provide Plaintiff with the report until June 28, 2006.

On September 1, 2006, Plaintiff sent a letter to Hartford, attempting to supplement her request for review by submitting a letter from a new doctor.  This doctor, Michael Neuwelt, stated that he first examined Plaintiff on May 4, 2006.  He diagnosed her with ankylosing spondylitis, an autoimmune disease.  He disagreed with the RRS report's conclusion that Plaintiff was capable of full-time work without restrictions or limitations, because the reviewing doctors "did not have before them the examination and test results showing ankylosing spondylitis and did not consider this diagnosis."  Roberts Dec. Ex. 4 at P00946.  Five days later, Hartford returned the additional materials Plaintiff had submitted. The letter explained, "Because we closed our administrative record for this claim on 4/26/06, we have not reviewed and are returning the documents you included with your 9/1/06 letter."  Id. at P00941.

Plaintiff now sues Hartford and the Plan under ERISA to obtain a reinstatement of her disability benefits.

II.  Factual Background on Plaintiff's Invasion of Privacy Claims

In January, 2001, Hartford's Special Investigations Unit (SIU) asked Defendant Dempsey Investigations, Inc. (Dempsey) to perform

surveillance on Plaintiff. This investigation was independent from the one described above. Pursuant to Hartford's instruction, a Dempsey investigator conducted surveillance of Plaintiff on February 2, 3 and 4, 2001. As part of this surveillance, the investigator videotaped Plaintiff when she was in her kitchen.

The relevant portion of the video was shot by zooming in on Plaintiff's kitchen window shortly before 6:00 p.m. on February 2. It was dark outside when the video was taken, and Plaintiff's kitchen light was on. There were no blinds or curtains obstructing the view through the window. Given the camera angle, it appears that the investigator was not positioned on Plaintiff's property, but rather across the street from her house.

In the video, Plaintiff can be seen from mid-chest up standing at a counter preparing food, placing an item in the microwave, moving around the kitchen, and drinking from a glass of wine. The video lasts approximately twenty minutes; Plaintiff is not in the field of view throughout this entire period.

Based on the Dempsey investigator's filming her while she was in her home, Plaintiff asserts claims against Hartford and Dempsey for invasion of privacy under the common law, Article I, § I of the California Constitution, and California Civil Code § 1708.8.

LEGAL STANDARD

I.   Plaintiff's ERISA Claim

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, each of the parties moves for judgment in its favor on Plaintiff's ERISA claims. Under Rule 52, the court conducts what is essentially a bench trial on the record, evaluating the

13

United States District Court

For the Northern District of California

persuasiveness of conflicting testimony and deciding which is more likely true.  <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1094-95 (9th Cir. 1999).

In an earlier order, the Court determined that it would review Hartford's decision to deny Plaintiff's disability claim under an abuse of discretion standard.  However, because of conflicts of interest inherent in the structure of the Plan, the Court also found that it would apply this standard with a moderate degree of skepticism.

Taking the Rule 52 procedure together with the standard of review, Plaintiff must prove by a preponderance of the evidence in the administrative record that Hartford's decision to terminate her benefits, when considered with a moderate degree of skepticism, constituted an abuse of discretion.  If Hartford's decision, considered with a moderate degree of skepticism, was reasonable and supported by substantial evidence in the administrative record as a whole, it was not an abuse of discretion.  <u>See</u> <u>McKenzie v. General Tel. Co. of Cal.</u>, 41 F.3d 1310, 1316-17 (9th Cir. 1994).

II.  Plaintiff's Invasion of Privacy Claims

Defendants move under Rule 56 for summary judgment on Plaintiff's invasion of privacy claims.  Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to

15

produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. <u>Id.</u>

DISCUSSION

I.   Plaintiff's ERISA Claim

Defendants argue that Hartford's decision to terminate Plaintiff's benefits must be upheld because the decision does not represent an abuse of their discretion, considering the administrative record as a whole. Plaintiff argues, to the contrary, that the record clearly demonstrates that she is totally disabled, and that Hartford's decision was not supported by substantial evidence.

Plaintiff's benefits were denied as a direct result of the June, 2005 surveillance video. Thus, a central question is whether it was reasonable for Hartford to conclude that Plaintiff was capable of returning to full-time work based on the videotape and the relationship between Plaintiff's activities on the videotape and her self-reported physical limitations.

Weighing the conflicting evidence, the Court finds that during the July 29, 2005 interview, Plaintiff was not forthcoming about the extent of her improvement in June, 2005. The video shows

16

Plaintiff performing activities that clearly and dramatically contradict her statements to Hartford's investigator. Although Plaintiff testified at her deposition that she told the investigator about the gardening session, this testimony is not supported by the statement she reviewed, edited, and signed immediately before being shown the surveillance video. In that statement, Plaintiff claimed to suffer from severe physical restrictions on an ongoing basis. She also stated unambiguously that, during the prior six months, she had not experienced a time when she could exceed the minimal level of functionality described in detail above.

The video shows Plaintiff performing vigorous yard work requiring the use of her arms in a way that far exceeded her reported abilities. Additionally, parts of her second written statement on July 29, 2005 -- made immediately after being confronted with the video -- are inconsistent with either the depictions in the video itself or with the declarations she later submitted in support of her appeal. For instance, in her statement, Plaintiff said that the weeds were in mud and came out easily, but this does not accord with the footage in the video. She also stated that it took her two weeks to recover from the gardening and bring her pain down to its usual level, but this claim is dubious given the footage of her walking her dogs for an hour and a half, then brushing them, the next day. She further stated that the videotaped gardening session was the first time she had gardened in nine years, but her gardener's later declaration said that Plaintiff had attempted to help the gardeners in the

17

past, albeit by performing easier tasks. Plaintiff's own declaration, submitted with her appeal, referred to a two-week period in June, 2005 during which she was elated and thought she might be getting better, but mention of such a period is absent from both of the statements she signed on July 29, 2005. It also contradicts the second statement's claim that she was in extreme pain while gardening, but did it anyway out of frustration with not having funds to pay for the work to be done.

The video does more than simply depict activities that are arguably incompatible with Plaintiff's claim of disability; when considered together with Plaintiff's self-reported limitations, the video severely damages her credibility. Because the record before Hartford contained no evidence of objective abnormalities that would conclusively establish the level of pain Plaintiff claimed to experience, her credibility was a key factor in evaluating her eligibility for benefits.

Nonetheless, it does not inexorably follow from the video footage that Plaintiff is capable of enduring the physical demands of full-time work, even in a sedentary position. The video depicts only a few scattered bursts of activity. It also shows Plaintiff repeatedly shaking her hands, supporting her claim that the gardening caused her to suffer pain and that she would not be able to maintain the depicted activity level for an extended period of time. Additionally, Plaintiff's treating physician stated that individuals who suffer from chronic pain disorders frequently experience cycles of improvement and worsening. Thus, it is possible that the video depicted a temporary improvement during

18

1 which Plaintiff was able to work in her garden and walk her dogs,

2 but not a recovery sufficient to enable her to return to work.

3     Although Hartford sought the opinions of three physicians

4 prior to issuing its final decision on appeal, none of them

5 addressed these points. They simply concluded that, because

6 Plaintiff's medical records revealed no objective abnormalities

7 that would prevent her from light-duty full-time work, and because

8 the video depicts Plaintiff exceeding her self-reported

9 limitations, she is capable of returning to work. None of the

10 reviewing physicians examined Plaintiff, nor did they explain how

11 they could extrapolate from the activity seen on the video, which

12 was limited in duration, to conclude that Plaintiff could meet the

13 physical demands of full-time work. In addition, Drs. LeForce and

14 Marion, who relied heavily on the video in reaching their

15 conclusions, were not completely accurate in describing the events

16 depicted in the video; they appear to have overstated the length of

17 time that Plaintiff was seen gardening. Moreover, as noted

18 previously, the reports of Hartford's reviewing doctors warrant

19 skepticism because the doctors stood to benefit financially from

20 their continued business with Hartford.

21     Hartford also failed to consider Dr. Neuwelt's diagnosis of

22 ankylosing spondylitis. Plaintiff claims that, to a greater degree

23 than the reports provided by her earlier doctors, Dr. Neuwelt's

24 report is based on objective medical findings that confirm her

25 reported limitations. It is true that Plaintiff did not submit

26 this material until after Hartford had already decided her appeal

27 and closed her file. However, Plaintiff requested an opportunity

28

to review and respond to any evidence Hartford considered prior to issuing its final decision on appeal. Hartford did not provide Plaintiff with the RRS report until after it had already made its final decision. Plaintiff contends that she would have responded to this report with Dr. Neuwelt's findings. Because the authors of the RRS report based their conclusions on a lack of objective abnormalities, Dr. Neuwelt's diagnosis could have materially affected Hartford's decision.

It appears that Hartford and its reviewing physicians gave overwhelming weight to the video surveillance, and did not adequately consider the rest of the evidence of Plaintiff's disability when making their decision to deny Plaintiff's benefits. Accordingly, the Court remands Plaintiff's claim to Hartford for further proceedings. See Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1288 (10th Cir. 2002) ("The remedy when an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision is to remand the case to the administrator for further findings or explanation.") It would be helpful to the Court if, on remand, Hartford considers Dr. Neuwelt's diagnosis of ankylosing spondylitis and addresses the other points raised above. It would also be helpful to the Court, and presumably to Hartford, if Plaintiff's treating physicians would watch and address the surveillance video and indicate whether they believe it is consistent with their diagnoses.

II. Plaintiff's Invasion of Privacy Claims

Plaintiff asserts claims against Hartford and Dempsey based on the video surveillance of her inside her home on February 2, 2001.

20

She claims that these Defendants committed the common law tort of invasion of privacy and violated § 1708.8 of the California Civil Code and Article I, § I of the California Constitution.[3] All of these causes of action require that a plaintiff have a reasonable expectation of privacy under the circumstances.

Under California law, an individual has no reasonable expectation of privacy with respect to activities observable in plain view from a public place where the observer has the right to be. See Lorenzana v. Superior Court, 9 Cal. 3d 626 (1973); People v. Stanley, 72 Cal. App. 4th 1547 (1999). While the majority of the cases addressing the concept of a reasonable expectation of privacy involve the Fourth Amendment's protection against unreasonable searches, Plaintiff provides no authority indicating that the standard should be any different when it comes to her asserted causes of action.

Plaintiff was videotaped standing in front of her kitchen window at night with the lights on, and with no blinds or curtains obstructing the view. Even though a person has a reasonable expectation of privacy inside his or her home as a general proposition, the investigator videotaped only activities that were plainly observable by someone standing on the street across from Plaintiff's house. Plaintiff thus had no reasonable expectation of privacy under the circumstances. That the investigator used a camera lens to zoom in on her does not change the analysis. At

---

[3]Plaintiff does not oppose Defendants' motion for summary judgment in their favor on her trespass claim. Accordingly, the Court grants Defendants' motion and dismisses this claim against all Defendants, including Dempsey.

most, the lens allowed the investigator to observe Plaintiff in more detail; it did not alter how much of her he could see, and there is no dispute that Plaintiff was visible with the naked eye. Cf. People v. Mayoff, 42 Cal. 3d 1302 (1986) (no reasonable expectation of privacy where marijuana crop was photographed with a telephoto lens from an airplane flying at one thousand feet). Accordingly, Plaintiff's invasion of privacy claims against Hartford and Dempsey cannot succeed.

CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment (Docket No. 53) is DENIED. Defendants' motion for judgment on Plaintiff's ERISA claim (Docket No. 61) is also DENIED. Defendants' motion for summary judgment on Plaintiff's trespass and invasion of privacy claims (Docket No. 61) is GRANTED, and these claims are dismissed.

Plaintiff's claim for benefits is remanded to Hartford for further proceedings consistent with this order. The case will be administratively closed pending Hartford's decision. It will be re-opened at Plaintiff's request.

IT IS SO ORDERED.

Dated: 12/14/07

_____
CLAUDIA WILKEN
United States District Judge

22