United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSTANCE FINLEY,<br><br>    Plaintiff,<br><br>  v.<br><br>HARTFORD LIFE & ACCIDENT INSURANCE CO.; THE BOSTON FINANCIAL GROUP LONG-TERM DISABILITY PLAN; and DEMPSEY INVESTIGATIONS, INC.,<br><br>    Defendants.<br>_____/ | No. C 06-06247 CW<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT AND DENYING THE PLAN'S CROSS-MOTION FOR JUDGMENT |

Plaintiff Constance Finley moves for judgment on her claim for disability benefits under the Employee Retirement Income Security Act (ERISA). Defendant The Boston Financial Group Long-Term Disability Plan opposes this motion and cross-moves for judgment on Plaintiff's claim. Plaintiff opposes the Plan's cross-motion. The matter was heard on September 24, 2009. Having considered oral argument and all of the papers submitted by the parties, the Court GRANTS Plaintiff's motion for judgment and DENIES the Plan's cross-motion for judgment.

BACKGROUND

I.  Prior Court Proceedings on Plaintiff's ERISA Claim

In October, 2006, Plaintiff filed her complaint against the

Plan and against Defendants Hartford Life and Accident Insurance Company and Dempsey Investigations, Inc.

On December 14, 2007, the Court granted summary judgment against Plaintiff on her privacy claims against Dempsey and Hartford, denied both Plaintiff's and the Plan's motions for judgment on her ERISA claim and remanded Plaintiff's case to Hartford for further proceedings. The Court found that Hartford and the physicians it retained to review Plaintiff's case appeared to give overwhelming weight to June, 2005 surveillance videos when they determined that Plaintiff was not disabled as defined by her insurance policy. Hartford did not give adequate consideration to other evidence of Plaintiff's disability, including Dr. C. Michael Neuwelt's diagnosis of ankylosing spondylitis. The Court asked Hartford, on remand, to consider Dr. Neuwelt's diagnosis. The Court also stated that it would be helpful if Plaintiff's treating physicians watched the surveillance videos and explained whether its contents were inconsistent with their diagnoses of Plaintiff.

The Court administratively closed the case pending Hartford's determination on remand, but provided that Plaintiff could move to re-open the case. Hartford notified Plaintiff on January 2, 2009 of its final determination that its termination of Plaintiff's benefits was proper. See Davis Decl., Ex. A at AR 0939-51.[1] On March 3, 2009, Plaintiff filed a motion to reopen the case, which the Court granted on April 3.

---

[1] All subsequent citations to Hartford's administrative record, which is contained in the Davis Declaration, are prefixed "AR."

2

II. Findings of Fact

    A.  Information Provided by Plaintiff to Hartford on Remand

On March 3, 2008, Plaintiff submitted the following materials to Hartford for review upon remand: a three-page letter by Dr. Neuwelt, Dr. Neuwelt's medical records spanning 2006 to 2007 and Dr. Daniel Shadoan's medical records spanning 2005 to 2008. See AR 1362-1476. In his letter, Dr. Neuwelt, a rheumatologist, discussed his diagnosis of Plaintiff's ankylosing spondylitis, a rheumatological condition. AR 1363. He stated that, because there are no laboratory tests for ankylosing spondylitis, his diagnosis was "solely based on history, physical exam, radiographs and other genetic markers." Id. He stated that an MRI showed abnormalities in Plaintiff's spine and that she had the HLA-B27 genetic marker, a characteristic found in ninety percent of Caucasian patients with the condition. AR 1363-64.

Dr. Neuwelt also addressed Plaintiff's activity depicted in the videos. He stated that the videos did "not in any way change my assessment of Ms. Finley's ability to work in any occupation with reasonable continuity." Id. Instead, according to Dr. Neuwelt, the videos "only validate the medical principle that patients with spondyloarthropy feel much better when they move around . . . ." AR 1364-65. Quoting a medical text, he stated that the pain and stiffness associated with ankylosing spondylitis "worsen after prolonged periods of inactivity," and are "eased by moving about . . . and with mild physical activity or exercise." AR 1365. He also stated that it is characteristic of ankylosing spondylitis for symptoms to "wax and wane." Id. He concluded by stating, "While mild physical activity helps alleviate

3

[Plaintiff's] symptoms, constant work without rest periods (up to six times an hour) would only exacerbate her condition." Id.

B. Hartford's Review and Affirmation of Denial on Remand

On remand, Hartford submitted Plaintiff's file to the University Disability Consortium (UDC) for review. Specifically, Hartford requested that UDC assess Plaintiff's condition from September 21, 2005 onward and "identify any restrictions and limitations that were warranted as of September 21, 2005." AR 1294. Of the eleven referral questions in Hartford's request, five addressed the June, 2005 surveillance videos:

> Several questions are posed with respect to the video surveillance obtained in June 2005. It is important that the reviewer does not afford either overwhelming weight or too little emphasis on the video surveillance.
>
> Please take into consideration that the video excerpts obtained in June 2005 depict scattered bursts of activity. Please comment on what conclusions can be reached based on a review of these activities.
>
> How does the surveillance evidence compare to the claimant's self reported limitations or those reported by the claimant's treating physicians?
>
> Is it possible that the video depicts a temporary improvement which allowed the claimant to sustain activity over and above her baseline?
>
> Overall, what conclusions can be drawn with respect to the video surveillance? Is the surveillance reflective of a specific level of function? Explain in detail.

Id. Drs. Brian Peck and Michelle Masi reviewed Plaintiff's records on behalf of UDC.

Dr. Peck, a rheumatologist, reviewed various documents, including the Court's December 14, 2007 Order, the 2005

4

surveillance videos and the February, 2008 letter from Dr. Neuwelt. Dr. Peck stated that he spoke with Dr. Neuwelt by phone, but did not personally examine Plaintiff.

A substantial portion of Dr. Peck's report relied on the surveillance videos. He rejected Dr. Neuwelt's diagnosis of ankylosing spondylitis, stating,

> There are no physical findings to document the presence of ankylosing spondylitis, and the claimant's abilities depicted on the surveillance videos are certainly not consistent with this diagnosis, or at least they are not consistent with the diagnosis of a case of ankylosing spondylitis that is active on a clinical level to a significant extent.

AR 1239. Dr. Peck also dismissed Dr. Neuwelt's observation that Plaintiff had the HLA-B27 genetic marker, opining that, while the existence of the marker "is frequently associated with the presence of the clinical disease known as ankylosing spondylitis, such positivity does not mean that the diagnosis is definite." Id. Dr. Peck also rejected Dr. Neuwelt's claim that Plaintiff's pain could "wax and wane." Dr. Peck stated,

> It is highly doubtful that the video depicts a temporary improvement, which allowed the claimant to sustain activity over and above her baseline. The activities depicted are so strenuous that it is impossible to conceive of any condition that could wax and wane so dramatically, from the level of symptoms self-reported to the level of activity, carried on with virtual abandon, as depicted in the videos. In particular, the ability to walk two large, muscular dogs for over an hour, <u>the day after</u> aggressively pulling weeds on a steep hillside for several hours is not consistent with the claimant's oft-repeated contention that after such activities she spends days or weeks in bed. While the symptoms and even the signs of many musculoskeletal conditions are known to wax and wane, they do not do so to the extremes we are asked to accept here.

5

AR 1238-37 (emphasis in original). As to Plaintiff's actions in the videos, Dr. Peck stated, "The obvious conclusion to be drawn from the video surveillance is that the claimant's self-reported symptoms are, at best, exaggerated." AR 1238. He concluded that Plaintiff was "capable of light level work on a full time basis as defined by the Dictionary of Occupational Titles." AR 1236.

Dr. Peck also used radiologists' written imaging studies to discount Dr. Neuwelt's ankylosing spondylitis diagnosis. He opined that their interpretations of Plaintiff's x-rays were "at odds" with Dr. Neuwelt's. AR 1237. As to which were correct, Dr. Peck did not opine, apparently because he did not review the x-rays himself.

Dr. Masi, a neurologist, also reviewed Plaintiff's medical records and the surveillance videos. She did not conduct an independent medical examination of Plaintiff. She stated that she spoke to Dr. Shadoan, who reportedly told her that he had viewed the surveillance videos and that they did not change his opinion that Plaintiff "is totally disabled from all gainful employment." AR 1250. Dr. Masi deferred to Dr. Peck's conclusions on ankylosing spondylitis, but concluded that there was no evidence that Plaintiff had a neurological deficit. AR 1251.

Dr. Masi stated that, although Plaintiff "may have some degree of fibromyalgia," the video surveillance contradicts Plaintiff's self-reported restrictions and limitations. Dr. Masi stated, "The findings of the video surveillance in June 2005 particularly underscored these discrepancies." AR 1252. Dr. Masi also commented on Plaintiff's 2006 declaration, stating that its creation contradicted Plaintiff's report that she could not "type

6

for longer than a minute." AR 1253. Dr. Masi opined that Plaintiff "somehow produced a 15-page closely worded document" and that Plaintiff "would have at least needed to handwrite such a document and there is no indication in the document that [Plaintiff] did not herself type the document." AR 1253. Dr. Masi made this conclusion although there was no evidence that Plaintiff herself hand-wrote or typed the document. Dr. Masi also concluded that Plaintiff was able to "perform long walks on a regular basis," id., although she did not explain this conclusion. As did Dr. Peck, Dr. Masi found Plaintiff "capable of full-time light level work . . . ." AR 1254.

Prior to issuing their respective reports on July 16, 2008, Drs. Peck and Masi conferred on July 7 and July 14. On July 14, two days before issuing their reports, they "agreed . . . that the claimant was capable of full time work at the light level." AR 1233.

On July 21, 2008, Hartford sent a letter to Plaintiff affirming its termination of her long-term disability benefits. AR 1270. Relying on Drs. Peck's and Masi's reports, Hartford concluded that Plaintiff would be able to "sustain light physical-demand-level work on a full-time basis" and therefore did not satisfy the insurance plan's definition of disabled. AR 1270. In the letter, Hartford noted that Dr. Masi "did not place undue weight on the surveillance evidence." AR 1267. However, a substantial portion of Dr. Masi's report focused on her conclusions drawn from the surveillance videos and Plaintiff's other activities.

7

C. Plaintiff's Request for Review of Decision on Remand

On October 20, 2008, Plaintiff sent the Plan's counsel a letter requesting a review of Hartford's decision to affirm its termination of Plaintiff's benefits.[2] Along with the request, Plaintiff sent a September 24, 2008 letter by Dr. Neuwelt, an October 15, 2008 letter by Dr. Shadoan and Social Security Administration (SSA) notices from February, 2000, June, 2006 and October, 2008.

Dr. Neuwelt's four-page letter reiterated his conclusions about Plaintiff's condition. He stated, "[I]t is my opinion, <u>without a reasonable doubt</u>, that Ms. Finley has been unable to work with any occupation with reasonable continuity between June 2005 and [September, 2008]." AR 1207 (emphasis in original). He also challenged Dr. Peck's conclusions. Dr. Neuwelt criticized Dr. Peck's rejection of the ankylosing spondylitis diagnosis, suggesting that Dr. Peck's failure to conduct a personal examination of Plaintiff made it "impossible for Dr. Peck to refute my physical findings . . . ." AR 1204. Dr. Neuwelt also challenged Dr. Peck's conclusions that the surveillance videos contradicted Plaintiff's report of her condition. He restated his view that Plaintiff's activity depicted in the videos demonstrates the medical principle that ankylosing spondylitis patients with "a spondyloarthropathy feel much better when they move around . . . ." AR 1206. Quoting Dr. Peck's report, Dr. Neuwelt asserted that "a surveillance video cannot refute a diagnosis made 'by combining the

---

[2] Plaintiff had sixty days from the date of Hartford's July 21, 2008 decision to submit a request for review. See Docket No. 121. Plaintiff's actual request was sent outside this sixty-day period. The Plan and Hartford nonetheless honored the request.

8

history, the physical examination, the laboratory findings, and the results of imaging studies.'" Id.

Dr. Shadoan provided a terse, one-paragraph letter stating that the surveillance videos did not change his opinion that Plaintiff is unable "to work in any occupation for which she would be qualified by education, training, and experience." AR 1208. He provided no analysis.

The SSA notices showed that Plaintiff was receiving Social Security benefits as of October 9, 2008.

D.  Hartford's Second Review on Remand

In its second review, Hartford employed three doctors: one from UDC and two from MES Solutions.

On November 11, 2008, Hartford sent its request to UDC. AR 1166-67. Included with the request were Plaintiff's medical records, including the materials from Drs. Neuwelt and Shadoan, and the surveillance videos. Hartford asked the reviewer to provide an opinion on the activity depicted in the surveillance videos, to "confirm [Plaintiff's] ability to lift/carry/push and pull and confirm the maximum amount of weight for each activity" and to determine whether "the evdience [sic] suggest that [Plaintiff] maintains the functional capability to consistently perform work for 8 hours per day 40 hours per week." AR 1167. With respect to the video surveillance, Hartford asked again for a reviewer's opinion but warned "not to afford the video to [sic] much or to [sic] little weight in your review of all of the information." Id.

Dr. Robert Marks, who is board certified in neurology and physical medicine and rehabilitation, reviewed Plaintiff's medical records and the surveillance videos. He did not conduct a personal

9

examination of Plaintiff.  Dr. Marks stated that he spoke to Dr. Neuwelt, who discussed Plaintiff's condition.  AR 1134.  Dr. Marks stated that Dr. Neuwelt said that Plaintiff was "doing particularly well" in the videos because of her Remicade medication.  Id.

Most of Dr. Marks' conclusions relied upon Plaintiff's activity in the videos.  Dr. Marks stated Plaintiff "appeared to be quite agile and robust" in the videos.  AR 1133.  He stated that Plaintiff would be able to perform consistently at the level depicted in the videos "if she were motivated to perform such activities."  AR 1137.  And to contradict Dr. Neuwelt's contention that Plaintiff had a spinal deformity, Dr. Marks stated that he "was able to examine the various surveillance video checks, and despite several viewings, did not see the described stooped spine deformity posture."  AR 1141.  Dr. Marks, in significant detail, concluded with respect to Plaintiff's ability to work that

> the work could entail sitting, standing and walking; it should be possible for adjustment of posture as reasonably necessary; it should be possible for claimant to take a brief break (a few minutes) every hour to permit change of position from sit to stand (or vice versa), take some steps, stretch, etc.; the claimant should be able to lift, carry, push or pull up to 10 lb on an occasional basis; the claimant is able to stoop, crouch, and kneel on an occasional basis; the claimant can ascend and descend a flight of stairs; reaching above the shoulder and below the waist on an occasional basis; reaching unlimited at the desk top level; grasping, feeling, and manipulation of objects should be possible on a frequent basis; the claimant should be permitted to use wrist splints if necessary.  Keeping the preceding in mind, sitting should be possible for up to 6 hours per day, standing for up to 2 hours per day, and/or walking for up to 2 hours.

AR 1238.  He stated that his opinion "was based on all information available," but did not cite to any specific sources.  Id.  Given

10

that the discussion preceding and following these findings focused on the videos, it appears that Dr. Marks' conclusions were based primarily on the surveillance.

Hartford also sent two requests to MES, dated November 24, 2008 and December 17, 2008. Both requests included the same materials submitted in Hartford's prior requests and contained referral questions substantially similar to those posed in the November 11 request to UDC.

Responding to the November 24 request, Dr. Leonid Topper, a neurologist, stated that Plaintiff's medical records did not show any neurological conditions. He declined to opine on Plaintiff's ankylosing spondylitis, stating that "the functionality related to this condition is beyond the scope of this neurological review and is deferred to the rheumatology [sic]." AR 1107. Nevertheless, after reviewing the video, Dr. Topper stated that it, along with Plaintiff's July, 2005 interview, "clearly documents that [Plaintiff] misrepresents her functionality." AR 1107. "From the neurological point of view," he concluded, Plaintiff can work "8 hours a day 40 hours a week." AR 1108. Dr. Topper did not explain how he arrived at this conclusion.

Responding to the December 17 request, Dr. Mark Burns, a rheumatologist, also concluded that there was no basis for Plaintiff's claimed restrictions and limitations on work. AR 0983. Many of Dr. Burns' conclusions do not include a medical analysis but instead summarily state that there was no medical evidence to support Plaintiff's claims. With regard to the videos, Dr. Burns stated that he believed Plaintiff could perform the level of activity depicted on a consistent basis. Id.

E. Final Decision on Remand

On January 2, 2009, Hartford issued its final decision reaffirming its termination of Plaintiff's long-term disability benefits. AR 0939-51. Based on Drs. Marks', Topper's and Burns' reports, Hartford concluded that Plaintiff "remained functionally capable of performing full time work activities at the sedentary level with the ability to change positions as needed." AR 0950. Because it concluded that Plaintiff could "consistently perform full time sedentary level work duties," Hartford confirmed its termination of Plaintiff's benefits. AR 0951.

Hartford acknowledged Plaintiff's Social Security benefits, but stated that it was not required to defer to the SSA's disability determination. AR 0950. Hartford noted that the SSA did not review Hartford's administrative record, which included the surveillance videos, in making its decision; thus, Hartford argued, a discrepancy between Hartford's and SSA's disability determinations was justified. Id.

CONCLUSIONS OF LAW

I. Standard of Review in ERISA Claims

Pursuant to Federal Rule of Civil Procedure 52, each of the parties moves for judgment in its favor on Plaintiff's ERISA claims. Under Rule 52, the Court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999).

A court's standard of review of a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan.

Absent contrary language in the plan, the denial is reviewed under a de novo standard. See Metro. Life Ins. Co. v. Glenn, ___ U.S. ___, 128 S. Ct. 2343, 2348 (2008). However, if the plan "provides to the contrary by granting the administrator . . . discretionary authority to determine eligibility for benefits," a deferential abuse of discretion standard is applied. Id. The application of this standard depends on whether the administrator operates under a conflict of interest. Montour v. Hartford Life & Accident Ins. Co., ___ F.3d ___, 2009 WL 2914516, *4 (9th Cir.). Where no conflict exists, the standard allows a court to uphold a plan administrator's decision "if it is grounded on any reasonable basis." (emphasis in original). Where a conflict exists, however, "a reviewing court must take into account the conflict and that this necessarily entails a more complex application of the abuse of discretion standard." Id. at *1. This requires a court to weigh and balance "case-specific factors, including the administrator's conflict of interest." Id. at *5. (citing Glenn, 128 S. Ct. at 2351-52). The weight a court accords the conflict depends on the circumstances of the case. Montour, 2009 WL 2914516, at *5. The conflict is "more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." Id. (quoting Glenn, 128 S. Ct. at 2351). It is less important "where the administrator has taken active steps to reduce potential bias and to promote accuracy." Id. (quoting Glenn, 128 S. Ct. at 2351). Additional factors a court should consider may include "the quantity and quality of the medical

13

evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary SSA disability determination, if any." Montour, 2009 WL 2914516, at *5.

In its August 20, 2007 Order, the Court found that the disability plan grants Hartford discretion and that Hartford operates under a conflict of interest. See Aug. 20, 2007 Order at 11. Accordingly, the Court reviewed Hartford's first decision to terminate Plaintiff's benefits for an "abuse of discretion with a moderate degree of skepticism." Id. at 12; see also Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 959 (9th Cir. 2006). Because the facts regarding Hartford's discretion and conflict have not changed, the Court applies a similar standard here. The Court's review is modified only by Glenn and Montour, decided after the August, 2007 Order, which require it to weigh and balance relevant factors. See id. at *7.

The Plan argues that "Hartford's decision is entitled to broad deference." Def.'s Cross-Mot. for J. 19. Glenn and Montour contradict the Plan's argument. Deference is not necessarily broad, particularly when a conflict of interest exists, as it does here; the Court's deference depends upon weighing the above-mentioned factors, including Hartford's conflict of interest. See Montour, 2009 WL 2914516 at *5.

II. Plaintiff's Renewed ERISA Claim

Pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Plaintiff seeks disability benefits under the Plan. This statute allows a participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Id.

The Plan argues that Hartford's decision to affirm the termination of Plaintiff's benefits must be upheld because it is reasonable and supported by substantial evidence. Plaintiff responds that Hartford abused its discretion by, among other things, continuing to give overwhelming weight to the 2005 surveillance, disregarding the observations of her treating physicians and failing to investigate Plaintiff's claim adequately.

Hartford's administrative record contains several indications that its conflict of interest tainted the decision-making process. Despite the Court's earlier warnings, the reviewing doctors working for the firms retained by Hartford relied heavily on the video surveillance of Plaintiff recorded on June 17 and June 18, 2005. All of the reviewing doctors received the videos and were guided by Hartford's referral questions in conducting their analyses. See AR 1049-50; AR 1293-94. Indeed, Dr. Peck's most thorough answers were those responding to questions about the videos. See AR 1235-1240. In particular, Dr. Peck stated, "The videos reveal that [Plaintiff] is capable of work at least at the level of light for prolonged periods of time, several hours at least, and even at the medium level for significant periods of time." AR 1236-37.

15

The other doctors also accorded substantial weight to the videos. Because Plaintiff's ankylosing spondylitis diagnosis is outside his clinical speciality, Dr. Marks' singular reliance on the videos makes his remarkably specific conclusions questionable, at best. Nevertheless, Hartford quoted Dr. Marks' report verbatim in its January, 2009 letter confirming its decision to terminate Plaintiff's benefits. AR 0946. Drs. Masi and Topper similarly rely on the videos.

The Plan argues that video surveillance can be a basis for a plan administrator's decision. While this is correct, the facts do not show that the videos were one of many considerations; instead, the videos provided the primary support for the doctors' conclusions. The videos did damage Plaintiff's credibility. However, as the Court noted in 2007, "it does not inexorably follow from the video footage that Plaintiff is capable of enduring the physical demands of full-time work, even in a sedentary position." Dec. 14, 2007 Order at 18. Hartford ignored this admonition, and continued to focus their reviewing doctors' attention on the videos. Hartford's continued reliance on the videos undermines the reliability of its determination and demonstrates a bias against Plaintiff.

The record also shows that the doctors made inferences in Hartford's favor. As stated above, Dr. Masi assumed, without any evidence, that Plaintiff hand-wrote or typed her fifteen-page 2006 declaration herself. See AR 1253. Further, Dr. Masi stated that Plaintiff can "perform long walks on a regular basis." Id. However, it appears that the only evidence provided to Dr. Masi to

support this conclusion was the videotaped surveillance of one such walk. These inferences in Hartford's favor demonstrate bias.

Another factor to be considered is Hartford's "pure paper" review of Plaintiff's case. Such a review "'raises questions about the thoroughness and accuracy of the benefits determination,' . . . ." Montour, 2009 WL 2914516, at *9 (quoting Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 554 (6th Cir. 2008)). None of the reviewing doctors conducted an independent medical examination of Plaintiff. Instead, they relied on Plaintiff's medical records and the surveillance videos. Indeed, three of the five reviewing doctors -- Drs. Marks, Masi and Topper -- were neurologists, two of whom explicitly conceded that Plaintiff's condition was outside their specialty. Dr. Topper acknowledged,

> The medical records only document that the claimant suffers from ankylosing spondylitis, which is a rheumatological condition. The issue of the functionality related to this condition is beyond the scope of this neurological review and is deferred to the rheumatology [sic].

AR 1107. Nevertheless, Hartford relied on the neurologists' conclusions in its determination.

The flaws of a paper process also appear in Dr. Peck's report. In part, Dr. Peck based his conclusions on the fact that Dr. Neuwelt disagreed with the radiologists' written interpretations of Plaintiff's x-rays. However, as the Plan's attorney conceded at the hearing, it is not clear that Dr. Peck, or any of the other

doctors, personally reviewed the x-rays.³  Thus, Dr. Peck rejected Dr. Neuwelt's conclusions in favor of the radiologists' without viewing the x-rays firsthand.  Dr. Peck acknowledged that ankylosing spondylitis is "a clinical diagnosis."  AR 1237.  However, none of the reviewing doctors saw Plaintiff in a clinical setting.

As in Montour, these circumstances create a "common theme . . . of presenting evidence of capability in the best possible light, while failing to subject evidence of capability to the same skepticism and rigorous analysis applied to evidence of disability."  2009 WL 2914516, *8 (quoting the lower court's description).  Moreover, the Montour case itself, where Hartford was the defendant, offers an example of Hartford's biased claims administration, which Glenn requires this Court to consider when determining the weight accorded to Hartford's conflict of interest.  See 128 S. Ct. at 2351.  Further, the Plan provided no evidence that Hartford "has taken active steps to reduce potential bias and to promote accuracy."  Id.  Because Hartford's bias appears throughout the remand proceedings, its conflict of interest is accorded significant weight.

The Court concludes that Hartford abused its discretion in terminating Plaintiff's benefits.  Although Hartford cited five doctors' opinions, these opinions were insufficient: three of the opinions were by neurologists, although Plaintiff's condition is rheumatological; all of the doctors relied heavily on the

---

³ Dr. Peck's report states that he only received "imaging reports."  AR 1228.  This suggests that he did not conduct an independent review of the x-rays.

18

surveillance videos, which do not conclusively establish Plaintiff's abilities; and none of the doctors personally examined Plaintiff. The quality and bases of the doctors' review, not simply the quantity of doctors' opinions proffered, are important.

CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment is GRANTED and the Plan's cross-motion for judgment is DENIED. The Plan shall reinstate Plaintiff's long-term disability benefits.

If they are unable to agree, the parties shall brief the amount owed to Plaintiff for benefits she should have received but for Hartford's improper September, 2005 determination, including prejudgment interest. Plaintiff shall file an opening brief by November 2, 2009. The Plan's opposition shall be due November 9. Plaintiff's reply, if any, shall be due November 16. The issue will be decided on the papers and judgment will then enter.

IT IS SO ORDERED.

Dated: October 26, 2009

CLAUDIA WILKEN
United States District Judge